Robert ADELSON

v.

GTE CORPORATION, et al.

Civ. No. JFM–91–2726.

United States District Court,
D. Maryland.

April 21, 1992.

James P. Koch, Baltimore, Md., for plaintiff.

Mark Holtschneider, Robert Levin, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendants.

## OPINION

MOTZ, District Judge.

Robert Adelson retired from GTE Corporation in 1983. He, his wife Mildred and their daughter Margaret have brought this ERISA action against GTE, GTE Service Corporation and The Travelers Insurance Company to recover benefits under GTE's group health plan.[1] The Plan is self-insured by GTE. The Plan Administrator is

the employee benefits committee of GTE Service Corporation, and Travelers is the claims administrator for the Plan pursuant to an administrative services agreement between GTE and Travelers.

The benefits in question are for care provided to Margaret Adelson at Chestnut Lodge Hospital, a private psychiatric hospital. Defendants contend the benefits are not covered by the Plan because the care which she is receiving is merely "custodial" in nature. Alternatively, they assert that she is an outpatient at Chestnut Lodge and, as such, is entitled to only $2,000 in benefits per year under the Plan.

### I.

#### A. *Ms. Adelson's Medical History*

Margaret Adelson is presently forty years of age. She was diagnosed as suffering from schizophrenia when she was an adolescent and has been in and out of psychiatric hospitals since that time. Between September 30, 1985 and June 1988, she was a patient in the Chestnut Lodge day hospital program. In June 1988 she was admitted to the acute inpatient unit. Some months thereafter she was released from that unit and lived in an apartment (purchased for her by her parents) approximately one mile from Chestnut Lodge. She returned to the hospital for daily treatment and care. On June 17, 1989, she was readmitted as a resident on the grounds of the hospital. As stated in a discharge summary dated August 16, 1990,

> Ms. Adelson was readmitted because she experienced great difficulty managing as an outpatient. When alone in the apartment each evening, she became disorganized and very anxious and agitated. Her hallucinations increased in intensity and frequency. She was troubled by suicidal ideation. She was readmitted to Little Lodge so that she could receive support and reassurance and so the treatment team could develop a modified outpatient plan in which she would re-

1. I will refer to GTE Corporation and GTE Service Corporation jointly as "GTE" in this opinion.

main closer to the support of the Lodge and have a more readily available social support network.

The discharge summary goes on to state Ms. Adelson's "hospital course" until she was discharged one year later:

Peggy's behavior on Little Lodge was described as 'increasingly psychotic and rageful.' She heard voices coming from the other patients or staff and would accuse people of crimes which they did not commit. Her behavior deteriorated. She often verbally abused and physically threatened other patients. Finally, on July 19, 1989, she was found throwing chairs in the Kiosk and menacingly pointing a lit cigarette in the face of one of the staff members. It was decided that Peggy needed to be placed on a locked unit. She was therefore transferred to Hilltop I.

Peggy's initial days at Hilltop were stormy. She was very anxious and agitated. She demanded reassuring answers from others, but could not be soothed. Her interpersonal manner was hostile and strident. On one occasion during the early days, she required seclusion after she assaulted a staff member.

Because Peggy's symptoms remained intense despite her medication regimen of Navane 40 mg. a day, lithium 900 mg. per day, and Ativan 6 mg. per day, it was decided to undertake a trial of clozapine. It was understood that Peggy had received clozapine during the mid 1970's while she was a patient of Dr. Nathan Kline's in New York. The trial was aborted for reasons that were impossible to determine from the medical records available to us. Thus, it is not clear that she ever received an adequate trial. Mr. and Mrs. Adelson informed us that Dr. Kline stopped the medication because Peggy made many non-specific complaints. They assured us that Peggy suffered no serious physical complication from taking the medication.

Prior to starting clozapine, we discontinued the lithium. The medical record offered no clear evidence that this agent had actually benefitted Peggy. Clini-

cians who had known her for some time concurred that it was questionable that lithium had ever had a positive effect. This time, Peggy did respond favorably to clozapine. The dose reached therapeutic levels, her level of anxiety and agitation diminished, she became capable of showing a broader range of affect. Her interactions were less need-centered and strident. In addition, she became receptive to psychosocial interventions, Dr. Heinssen developed a behavioral modification treatment program especially for Peggy. The program rewarded Peggy for attending to and controlling specific aspects of her interpersonal behavior. Peggy proved to be receptive to the feedback provided by the plan. With time, she became better able to regulate the volume of her speech, inappropriate laughter, inappropriate personal distance, and interpersonal hostility.

By early 1990, Peggy had earned a good deal of unescorted privileges. She had performed well on Sullivan groups and was beginning to establish a full schedule of hospital Rehabilitation Department based activities. In February, she was transferred to the unit transitional apartment. She showed impeccable adherence to the daily routine. Personal hygiene was good. Her room was neat and in order.

Although Peggy continued to show intermittently periods of anxiety and agitation—usually associated with such stressors as conflict around relation with parents, contemplation of separation from the unit—Peggy's functioning remained good. In June she was discharged to Hilltop House residential treatment program (Rehab/Amb. Care Supervised Living). She will continue to return to attend the Sullivan House day treatment program.

As stated in the last paragraph of the discharge summary, upon her discharge in June 1990, Ms. Adelson resided at Hilltop House, a supervised residential facility located on the grounds of Chestnut Lodge. While living at this facility, Ms. Adelson participated in the hospital's day hospital

program. In January 1991 she moved to her nearby apartment. She has lived there since. However, she continues to participate in the day hospital program seven days a week, ordinarily returning to her apartment only at night. She is under direction to call a nurse at the hospital when she arrives at her apartment, and she reliably does so. She also has 24–hour access to the hospital and frequently calls in at night when she becomes anxious. She has some "snack foods" in the apartment but regularly eats at the hospital.

In addition to being permitted to travel to and from her apartment, Ms. Adelson is free to leave the hospital during the day to venture into the community on outings. Her treating psychiatrist, Dr. Ann–Louise Silver, encourages such outings and has gone shopping with her on a number of occasions. Ms. Adelson also goes on trips into Rockville organized by Chestnut Lodge's rehabilitation staff.

Most of Ms. Adelson's waking hours are, however, spent on the hospital grounds. She arrives at Chestnut Lodge by cab at approximately 9:00 in the morning. She takes her medication with the assistance of the nursing staff. Once a week she is given a venepuncture so that the white blood cells in her blood can be counted. This is necessary because one of the known side effects of Clozapine is agranulocytosis, a potentially fatal blood disease characterized by extreme leukopenia, fever and ulceration of the mucous membranes. Four times per week Ms. Adelson has a psychotherapy session with Dr. Silver. The remainder of every day is highly structured for her. She engages in such activities as a music appreciation class, a literary appreciation class, a walking group, a current events group, a women's group, a nutritional awareness group and a social skills group. These activities are all part of the therapy and rehabilitation programs designed by the hospital's professional staff. They are not attended by a psychiatrist, psychologist or social worker. However, with the possible exception of the music appreciation class, a member of the nursing staff participates in all of the activities.

Before she began to take Clozapine, Ms. Adelson was suffering from progressive tardive dyskinesia, a disfiguring neurological problem akin to Parkinson's Disease. The Clozapine has arrested the development of the disease. It has also had a beneficial effect upon Ms. Adelson's psychiatric condition. According to Dr. Silver, before Ms. Adelson was prescribed Clozapine, "she was experiencing cars that were 30 feet away from her as about to hit her. Street lights she would experience as torches about to burn her up." She has not "had that kind of terror in recent years." However, symptoms from which she presently suffers are "along that continuum" and are only "less severe."

Dr. Silver has testified on deposition that there is a serious risk that Ms. Adelson would commit suicide "if she didn't have the structure of the hospital." Dr. Steven B. Israel, the clinical administrative psychiatrist at Chestnut Lodge responsible for the overall course of treatment for Ms. Adelson, similarly believes that the structured activities in which Ms. Adelson engages are necessary to prevent her from being "overwhelmed by her symptoms." Dr. Radhaa Majumdar, the psychiatrist who reviewed Ms. Adelson's medical records for Travelers, concluded that "her being independent and living alone is probably out of the question." Likewise, Roann Walters, a registered nurse who serves as a case manager for Travelers, found that "there is no indication … that … [Ms. Adelson] will be able to sustain a 'normal' existence away from a protected and supported setting." She recommended that Ms. Adelson be placed permanently in a state psychiatric hospital.

### B. Defendants' Decision to Deny Benefits

Prior to October 1988, GTE provided health benefits to its employees through insurance policies issued by Travelers. On October 1, 1988, GTE became self-insured. As stated above, the employee benefits committee of GTE Service Corporation is now the Plan Administrator for GTE's health plan. All of the members of the Committee are employees of GTE. Travel-

ers has been retained by GTE as a "claims administrator" to process claims for benefits.

Under the terms of the Plan Ms. Adelson has a lifetime limit of $750,000 in benefits. The amount of the lifetime benefit remaining to Ms. Adelson is approximately $540,-000.00 The Plan pays 90% of reasonable charges for hospital room and board and related charges during the first seven days of hospitalization and 100% thereafter. It pays 80% of reasonable charges for medical services and supplies during hospitalization. It pays benefits for inpatient psychiatric treatment to the same extent that it does for any other illness. For persons suffering from mental and nervous disorders who are "not confined as a hospital inpatient," the Plan pays benefits of up to $40 per session for 50 psychotherapy sessions per year. The Plan excludes coverage for any expenses for "custodial care."

Travelers paid all claims submitted by Chestnut Lodge for treatment and care provided to Ms. Adelson from 1985 through July 31, 1990. However, on April 19, 1991, Travelers advised Mr. Adelson that it would not pay the cost for treatment and care for Ms. Adelson incurred after August 1, 1990 and would discontinue payment for all such costs in the future.[2] The only ground stated by Travelers for this decision was that the care being received by Ms. Adelson after July 31, 1990 was "custodial in nature." Mr. Adelson (through counsel) appealed this decision by a letter dated July 1, 1991. John W. Large, Jr., identifying himself as "Plan Administrator," responded to this appeal by a letter dated July 8, 1991. In the letter Large stated "I will advise you of my decision within the next 60 days." The Plan Administrator did not act on the appeal however, and this suit was filed on September 20, 1991. It was not until February 21, 1992—

after this action was filed and plaintiffs had filed their motion for summary judgment—that GTE decided the appeal, affirming Travelers' determination that Ms. Adelson was receiving "custodial care." This decision was communicated to the Adelsons' counsel by a letter dated February 26, 1992.

## II.

Defendants contend that GTE's determination that Ms. Adelson was receiving merely custodial care must be upheld unless GTE abused its discretion in making that determination. The rule governing the standard of review question in ERISA cases is now well established. If "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a reviewing court must give deference to the administrator's decision and overturn this decision only if it constitutes an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 114–15, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). A *de novo* review is appropriate only if the plan does not give such discretion to the administrator. *Id.*

The relevant section of GTE's Plan Benefits Booklet provides as follows:[3]

> The plan administrator and designated fiduciaries have the discretion to determine eligibility for participation, benefits, and coverage; remedy possible plan ambiguities; and otherwise interpret the plan in accordance with clearly defined and ascertainable criteria specifically set forth in the plan.

Focusing upon the last clause of this section, the Adelsons contend that GTE does not have the discretion to determine the meaning of the term "custodial care" because the plan does not specifically set

---

**2.** Excepted from this decision were costs incurred from November 27, 1990 through January 2, 1991 when Ms. Adelson was admitted to an inpatient unit at Chestnut Lodge, following an appendectomy.

**3.** The Plan Benefits Booklet is the "summary plan description" required of all ERISA plans. 29 U.S.C. § 1022(a)(1). It has been filed with

the Secretary of Labor and was distributed to plan participants. It is written in plain English without unnecessary legalese. Therefore, the terms which it contains are valid and enforceable. *See* 29 U.S.C. §§ 1022(a)(1), 1024(a)(1)(C), 1024(a)(1)(D) and 1024(b); *White v. Jacobs Eng. Group Long Term Disability Benefit Plan,* 896 F.2d 344 (9th Cir.1989).

forth "clearly defined and ascertainable criteria" regarding what constitutes "custodial care." GTE argues that the term "custodial care" is itself a criterion which GTE has the discretion to interpret. This is a rather nice point which I do not find necessary to resolve. Assuming that the Adelsons are correct in their contention, the "clearly defined and ascertainable criteria" proviso applies only to the discretionary authority conferred upon the plan administrator to "otherwise interpret the plan." The plan administrator is also given the discretion "to determine eligibility for ... benefits" and to "remedy possible plan ambiguities." These clauses are themselves sufficient to trigger the abuse of discretion standard of judicial review. As the Fourth Circuit has stated, "it ... need only appear on the face of the plan documents that the fiduciary has been 'given [the] power to construe disputed or doubtful terms'—or to resolve disputes over benefits eligibility—in which case 'the trustee's interpretation would not be disturbed if reasonable.'" *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187 (4th Cir.1989) (*quoting Bruch*, 489 U.S. at 111, 109 S.Ct. at 954).

### III.

### A.

■ In applying the abuse of discretion standard, a court may not substitute its judgment for that of the plan administrator or overturn a decision of the plan administrator which is reasonable simply because another interpretation may be more reasonable. *See de Nobel*, 885 F.2d at 1188. " '[W]here claim eligibility is involved, it is necessary to ensure that primary responsibility rests with administrators whose experience is daily and continual, and not with judges whose exposure is episodic and occasional.'" *Holland v. Burlington Industries, Inc.*, 772 F.2d 1140, 1148 (4th Cir. 1985), *cert. denied*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986), (*quoting Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1006 (4th Cir.1985)). However, simple recitation of black-letter rules of law can reduce ERISA to banality. It must be remembered that the decisions of plan administra-

tors are entitled to deference because the plan administrators are *fiduciaries* charged with the responsibility to make decisions critical to the lives of individual citizens. To a very real degree they are on the front line in determining the extent and the quality of health care being delivered in this country. They have the duty to assure that the financial integrity of health plans is preserved by denying improper claims, however difficult such decisions may be. In doing so they assist in placing restraints upon health care providers who, if left to their own devices, might well permit health care costs to continue to spiral upward. However, that said, plan administrators have a duty to assure that valid claims of beneficiaries who are in need of medical care are not denied simply because of the cost of such care.

■ A factor extrinsic to the articulated basis for a plan administrator's decision, which a court should take into account in determining whether the plan administrator has abused its discretion, is whether the plan administrator is operating under a conflict of interest. *Bruch*, 489 U.S. at 115, 109 S.Ct. at 956 (*citing Restatement (Second) of Trusts*, § 187, comment d (1959)). That such a conflict of interest exists here is self-evident. GTE self-insures its group health plan and only GTE employees are members of the committee which makes benefits decisions. The denial of a claim, such as the one made by the Adelsons here, involving substantial medical costs would directly improve GTE's bottom line. Under these circumstances, particularly against the background of an economic recession and the unfortunate emphasis which American business places upon short-term profits, a more direct conflict of interest could scarcely be imagined. *See generally Newell v. Prudential Ins. Co. of America*, 904 F.2d 644, 650–52 (11th Cir.1990); *Jader v. Principal Mutual Life Ins. Co.*, 723 F.Supp. 1338, 1341 (D.Minn. 1989).

### B.

■ An analysis of the articulated basis for denying Ms. Adelson benefits demon-

strates that GTE was, in fact, influenced by its own self-interest and that it abused its discretion in making its decision. The only ground recited for denying the benefits was that Ms. Adelson is merely receiving "custodial care." That term is not defined in the Plan documents and it appears to have a common sense meaning: the providing of assistance by a lay person without special skills in such matters as eating, clothing, washing and toileting. This is the way that Dr. Israel understood it. It is also the way that the Fourth Circuit and numerous other courts have interpreted it. *See, e.g., O'Connor v. Central Virginia U.F.C.W.,* 945 F.2d 799 (4th Cir.1991); *Coe v. Secretary of Health, Ed., and Welfare,* 502 F.2d 1337 (4th Cir.1974); *Hirsch v. Bowen,* 655 F.Supp. 342 (S.D.N.Y.1987).

■ However, Ms. Walters, the registered nurse who served as a Travelers' "claims agent" and whose determination to deny benefits was adopted by GTE, found that the care being provided to Ms. Adelson is "custodial" in nature. She reached this conclusion by applying a four-factor test of her own choosing:

1. One who is mentally or physically disabled and such disability is expected to continue and be prolonged indefinitely.
2. One who requires a protected, monitored and or controlled environment.
3. One who requires assistance to complete the essential [sic] of daily living.
4. One who is under active and specific psychiatric treatment that should reduce the disability to the extent necessary to enable the patient to function outside of the protected, monitored, and or controlled environment, but the patient has demonstrated that he/she has already reached his/her maximum level of functioning.

It may well be that GTE committed an abuse of discretion simply by virtue of the fact that when it adopted Ms. Walters' determination, it applied an artificial definition to words of plain and ordinary meaning.[4] Assuming, however, that this is not so, GTE nevertheless abused its discretion because Ms. Walters' application of her own test is fundamentally flawed. The third factor of her test is that the patient "requires assistance to complete the essential [sic] of daily living." This language appears plainly to signify (even more than the term "custodial care") that the patient need assistance in such fundamental activities as eating, clothing, washing and toileting. If that is so, Ms. Adelson (who indisputably does not need such assistance) does not fall within Ms. Walters' definition of patients requiring custodial care since the four elements of Ms. Walters' test are conjunctive.[5] Moreover, even if the third factor could be construed as meaning something other than requiring assistance for eating, clothing, washing and toileting, it cannot—by definition—mean requiring "a protected, monitored and/or controlled environment" since the latter is the second factor of Ms. Walters' conjunctive test. Yet it was only because Ms. Adelson requires such an environment that Ms. Walters concluded that she is receiving "custodial care."

GTE attempts to support Ms. Walters' decision by alleging that Dr. Israel testified on deposition that the daily activities in which she engages at Chestnut Lodge are merely things "to keep her occupied." This is an unfair and unsound characterization of his testimony. The phrase which

---

**4.** GTE seeks to justify its decision by pointing out that Ms. Walters' four-factor test is based upon a nearly identical test set forth in the Code of Federal Regulations defining custodial care for the Federal Civilian Health and Medical Program of the Uniform Services (CHAMPUS). *See* 32 C.F.R. § 199.2(b). However, no reference is made to the CHAMPUS regulations in GTE's Plan documents. In any event, for the reasons stated in the text, *infra,* Ms. Adelson is not receiving custodial care under the CHAMPUS regulations themselves, as properly construed.

**5.** The portion of Ms. Walters' report quoted above does not itself reflect that her test required each of the four factors to be met in order to establish that the care being provided is custodial. However, the conjunctive nature of the test is demonstrated by the fact that Ms. Walters found that Ms. Adelson "has met 4 criteria for determining chronic and custodial classification." Moreover, the CHAMPUS four factor test, upon which Ms. Walters' test is based, is conjunctive.

GTE picks out was spoken in the following context:

Q. Let's talk about the present time now, and then I will ask you about your estimated (*sic*) as to the future. So let's first talk about present time.

A. At the present time, I think that she requires ... what she has which is a setting where she has—her time is structured . where she's involved in activities that keep her busy and help her to ward off the impact of the symptoms that she experiences. She needs—she's going to need medication that I've outlined.

She's going to need access to experienced and trained staff in order to assess her condition and also to administer through various modalities ... to help her cope with her symptoms ... and organize her functioning.

\* \* \* \* \* \*

... [S]he certainly doesn't need a control protected environment, needs to be put in a padded room with closed circuit TV cameras, doesn't need a protected control environment so she doesn't hurt herself or that kind of thing, but does need, in order to prevent her from being overwhelmed by these symptoms and driven to those kinds of contacts ... something to keep her occupied and the assessment of interventions that the trained staff can provide.

That's pretty much all I can say about that.

Q. Would she need more in terms of her environment, would she need more than simply to be in a home or an apartment off the hospital with let's say a telephone access to the hospital, would she need more than just that?

A. Probably. Yes.

The importance of Ms. Adelson's participation in the daily programs at Chestnut Lodge is even more dramatically demonstrated by Dr. Silver's opinion (expressed on deposition) that if Ms. Adelson "were

put in a less structured situation," she would be "a very, very severe suicidal risk." Neither Dr. Majumdar or Ms. Walters contradicted this opinion. To the contrary, they agree that she needs "a protected and supported setting."

In short, the record is undisputed that Clozapine is only one of the two critical aspects of the medical treatment which Ms. Adelson is receiving. The other is her participation in the daily programs at Chestnut Lodge. These programs are professionally designed and administered. Ms. Adelson does not simply "sit around" having her "time occupied." She is continuously engaged in activity and assessed by trained and skilled medical workers. But for the opportunity to participate in the daily programs, she would, in the words of Dr. Israel, be "overwhelmed by her symptoms." [6]

### C.

There is a final piece of evidence which corroborates that GTE abused its discretion in determining that Ms. Adelson is receiving merely custodial care. Until August 1990 Travelers and GTE were paying the costs of all of the care which she was receiving at Chestnut Lodge. They assert that the reason that they stopped paying benefits at that time was because they learned that in June 1990 Ms. Adelson had moved to her apartment off the Chestnut Lodge grounds. However, as defendants themselves posit, the Plan excludes the payment of the cost of *all* custodial care, whether the beneficiary is an "inpatient" or an "outpatient." Therefore, if the daily programs provided at Chestnut Lodge are merely "custodial care," no benefits for them should have been paid during the many years that Ms. Adelson resided on the hospital grounds.

I fully accept the veracity of defendants' contention that it was Ms. Adelson's move to the apartment which was the catalyst

---

**6.** It is no answer to say, as Ms. Walters suggests, that Ms. Adelson can be placed in a state psychiatric institution. Assuming that the programs at such an institution are as effective as those at Chestnut Lodge, they are not "custodial" simply because they are state-provided. On the other hand, if they are merely custodial in the ordinary sense, that does not mean that the professionally designed and administered programs at Chestnut Lodge are similarly custodial.

for Travelers' re-evaluation.[7] However, in making its re-evaluation GTE interpreted the terms of the Plan inconsistently with its own past practice. This itself is a factor showing that it has abused its discretion in now denying Ms. Adelson her benefits. *See de Nobel*, 885 F.2d at 1188.

## IV.

GTE's Plan Benefits Booklet provides that "if you are confined to a hospital because of a mental disorder ..., the Plan will pay benefits just like it would for any other illness." It goes on to state that:

> If you receive outpatient treatment for a mental health disorder, the plan will pay 80% of reasonable charges up to $50 for each visit for up to 50 visits in a calendar year. (So, for each visit, the plan will pay no more than 80% of $50—or $40.) You must meet the deductible before these benefits are paid.

This paragraph summarizes a similar provision in the benefits section of the insurance policy which is the underlying Plan document. GTE argues that the effect of the provision is to limit the benefits payable to Ms. Adelson to $2,000 per year.[8]

As a threshold matter, this argument raises an intriguing standard of review question. Although GTE did articulate the "outpatient" theory in its answers to interrogatories, it did not rely upon that theory as a ground for denying benefits to Ms. Adelson. Thus, any contention that a decision based upon the theory should be reviewed under an abuse of discretion standard rings hollow. By definition, in order to be entitled to that standard of review, GTE must have actually exercised its discretion to make a particular decision in the first instance.

Therefore, the most to which GTE conceivably would be entitled is that its "outpatient" contention be decided by me *de novo*. At oral argument GTE's counsel suggested this course. The suggestion was graceful and professional. However, the very fact that it was made demonstrates how far we, as judges, have come in ignoring the purpose behind the rules which we have adopted. Lawyers' after-the-fact rationalizations are now being seriously put forward as substitutes for the presumably deliberate and considered reasoning process of those charged with fiduciary duties under the ERISA scheme.

Presumably, GTE, as the person "whose experience is daily and continual," *see Holland v. Burlington Industries, Inc.*, 772 F.2d at 1148, did consider the inpatient/outpatient issue and implicitly decided that it did not constitute a ground upon which to deny benefits to Ms. Adelson. I recognize that the term "outpatient" is used to describe Ms. Adelson in her medical records at Chestnut Lodge. However, that very fact, so glaring and blatant, tends to demonstrate that if Travelers and GTE genuinely believed that Ms. Adelson is an "outpatient" within the meaning of the Plan, they would have stated so expressly when rendering their decision.[9]

The contrary conclusion—which I infer that Travelers and GTE reached on the issue—was clearly correct. The words "inpatient" and "outpatient" are not explicitly defined in the Plan. One can argue, as defendants' lawyers now argue, that literally any patient who is not "confined in a hospital" is an outpatient. However, to

---

7. The record is clear that it is only because Ms. Adelson's parents can afford to provide her with an apartment off the grounds of Chestnut Lodge that she is not required to reside at the hospital. It would be, at the least, ironic if her good fortune in that regard were to work against her to deprive her of her equal good fortune in being a beneficiary under GTE's Plan.

8. Ms. Adelson presently is obtaining the Clozapine prescribed for her free of charge from its manufacturer and she will continue to do so until 1994 if she remains at Chestnut Lodge. This is due to the fact that she first began to take Clozapine as part of a research study sponsored by the manufacturer. It appears that if and when Ms. Adelson no longer receives Clozapine free of charge, its cost would be separately reimbursable under the Plan.

9. Let me add that if this case were remanded to GTE for a decision on the outpatient/inpatient issue and if GTE determined that Ms. Adelson is an "outpatient" within the meaning of the Plan, I would find (for the reasons stated in the text *infra*) that it had abused its discretion in doing so.

put it most charitably, such an argument is archaic. Literal interpretation of the term "confinement" would mean that a patient must be under lock and key, thereby excluding from coverage virtually all patients residing in psychiatric institutions (other than those confined at a stage of crisis in a padded room). No responsible health care professional, let alone a person charged with fiduciary duties, would interpret the Plan to countenance such a result.

As a practical matter, developments in the treatment of mental illness which have occurred in recent years have dissolved the rigid inpatient/outpatient dichotomy drawn by the literal language of the Plan and have stripped it of sensible meaning. In the nineteenth century there was an enlightened shift from incarcerating chronically ill mental patients in prison-like institutions to providing them with a permanent residence in bucolic surroundings under the care of a professionally trained staff. So too, today, there has been an almost equally dramatic conceptual change in the strategy for long-term psychiatric care. No longer are all patients who suffer from chronic mental illness required to reside permanently in uniform facilities under constant surveillance. Rather, individual patients are given differentiated treatment, depending upon their particular needs. Well managed psychiatric hospitals now offer a variety of facilities and programs covering a broad spectrum from acute care beds to community-based clinical programs. Included in the range of services provided by these hospitals are off-campus apartments and group homes (sometimes owned by the hospital itself), as well as half-way and quarter-way houses located on the hospital's grounds for patients who can, to a limited degree, live independently but who daily require the protection of a structured environment.

The benefits of this "continuum of care" concept, both for improving the quality of patient care and controlling the cost of that care, are self-evident. In the latter regard, an ERISA fiduciary would certainly not be acting in the interest of preserving the financial integrity of a plan if it were to discourage health care professionals from providing less costly differentiated treatment by interpreting the plan as permitting the payment of benefits only to patients living twenty-four hours a day in restricted and expensive settings.

Reasonable persons can reasonably disagree with one another as to the level of care which an individual patient requires in a particular factual context. As long as an ERISA fiduciary makes a good-faith determination in a given case as to the level of care which is needed, rather than merely attempting to escape coverage altogether because of the cost of the care, its decision is entitled to deference by a reviewing court. However, where, as here, the record is undisputed that a patient requires a highly structured environment to prevent her from being terrorized and overwhelmed by her symptoms—to prevent her from being subject to a serious risk of suicide—no responsible fiduciary could conclude that she was merely an "outpatient" entitled to be reimbursed only for 50 psychotherapy sessions per year. Neither Travelers nor GTE's employee benefits committee so concluded, and their implicit decision that Ms. Adelson is not merely "an outpatient" was clearly correct.

## V.

Because ERISA cases frequently touch "our human sympathies," courts of appeals have cautioned judges "to take care, for the general good of the community, that hard cases do not make bad law." *Cathey v. Dow Chemical Co. Medical Care Program*, 907 F.2d 554, 555 (5th Cir.1990) *cert. denied*, —— U.S. ——, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991); *O'Connor v. Central Virginia U.F.C.W.*, 945 F.2d at 802. That admonition is not inappropriate. However, it is also true that occasionally "bad law" makes "hard cases." The rules which have evolved concerning the standard of review of the decisions of ERISA fiduciaries are not themselves "bad law." However, if courts blindly apply these rules to rubber stamp all decisions made by the administrators of ERISA plans, forgetting that those decisions are entitled to deference precisely because of the serious duties imposed upon

the plan administrators as fiduciaries, "bad law" will have developed in practice. Here, GTE's adoption of Traveler's determination that Ms. Adelson should be denied benefits cannot withstand critical scrutiny and must be overturned.

A separate order effecting the rulings made in this opinion is being entered herewith.

## ORDER

For the reasons stated in the opinion entered herein, it is this 21st day of April 1992

ORDERED

1. Plaintiffs' motion for summary judgment is granted;

2. Defendants' motion for summary judgment is denied; and

3. Judgment is entered in favor of plaintiffs against defendants.