Robert E. FUQUA, Plaintiff,

v.

TARMAC OF AMERICA, INC. and B. Edward Pittman, Defendants.

No. CIV.A. 202CV138.

United States District Court, E.D. Virginia, Norfolk Division.

Oct. 29, 2002.

Robert l. Mills, Rutter, Walsh, Mills & Rutter LLP, Norfolk, VA, for Plaintiff.

David J. Sullivan, Burt H. Whitt, Scott W. Kezman, Kaufman & Canoles, PC, Norfolk, VA, for Defendant.

## *OPINION*

REBECCA BEACH SMITH, District Judge.

This action is before the court on plaintiff's and defendants' cross-motions for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motion for summary judgment is **GRANTED** and plaintiff's motion for summary judgment is **DENIED.**

### *Factual and Procedural History*

Plaintiff Robert E. Fuqua ("Fuqua") filed an action against Tarmac of America, Inc. ("Tarmac") and B. Edward Pittman ("Pittman") in the Circuit Court of the City of Virginia Beach.[1] The action was removed to this court by Tarmac per a notice of removal pursuant to 28 U.S.C. § 1441 *et seq.*, filed March 1, 2002. Tarmac answered the complaint on March 7, 2002, and Pittman answered on April 10, 2002. On August 22, 2002, Tarmac and Pittman filed a motion for summary judgment and a memorandum in support. Fuqua failed to respond to this motion by the deadline. On September 26, 2002, after the time for response to defendants' motion had passed, Fuqua filed a cross motion for summary judgment and a memorandum in support.[2] Defendants filed an opposition to plaintiff's motion for summary judgment on October 4, 2002. The court has reviewed the submissions before it and has determined that a hearing is not required. The matter is therefore ripe for review.

Plaintiff Fuqua is the former Chief Financial Officer of Tarmac. On February 21, 2000, in anticipation of the sale of Tarmac, Fuqua and other members of the company's executive team entered into agreements entitled Executive Group Agreement and Release ("EGAR") that set out terms of severance benefits available if an executive was terminated or otherwise materially affected by the sale of Tarmac. The EGAR provided for a severance payment of eighteen (18) months pay at the rate of the participant's base salary on the date of the agreement. On October 1, 2000, Tarmac was acquired by Titan Atlantic, LLC ("Titan"). Shortly after the acquisition, plaintiff and four other executives were terminated without cause. On October 27, 2000, plaintiff was paid $310,870.00, the severance benefits due him under the EGAR.

On November 1, 1995, Tarmac had adopted a Supplemental Executive Retirement Plan ("SERP"), a lucrative retirement plan open only to members of Tarmac's executive committee. Fuqua participated in this plan, which was funded partially by contributions from the members and partially by contributions from Tarmac. The terms of the SERP provided that Tarmac would pay, each December 31 and June 30, an amount equal to ten percent (10%) of the partici-

---

1. Defendants assert that under ERISA, the benefit plan is the only proper party to this suit. As the disposition of the summary judgment motions is in favor of the defendants, the court assumes without deciding that the parties are proper. However, the court notes that as Tarmac administers the plan in question, plaintiff has essentially sued the plan by naming Tarmac. *See Gluth v. Wal–Mart Stores,* No. 96–1307, 1997 WL 368625, 1997 U.S.App. LEXIS 16451, at *18 n. 8 (4th Cir. July 3, 1997) (citing *Daniel v. Eaton Corp.,* 839 F.2d 263, 266 (6th Cir.1988)).

2. As Fuqua failed to respond timely to Tarmac's summary judgment motion as required

by Local Rule 7(E), the undisputed facts as set forth in that motion remain undisputed. *See Withers v. Eveland,* 988 F.Supp. 942, 945 (E.D.Va.1997) (citing *Custer v. Pan Am. Life Ins. Co.,* 12 F.3d 410, 415–16 (4th Cir.1993)). The response was due on September 5, 2002. Fuqua did not file the cross motion until September 26, and even in his cross motion, Fuqua does not attempt to answer or dispute the defendants' facts directly; rather, he has a section purporting to be his undisputed facts. The section is a narrative, with some citations in support. Parts of it appear to be more argument than a statement of facts.

pant's compensation for the six-month period ending on that date, plus a gross-up calculated by ascertaining the income and payroll taxes that would be due on the ten percent.

Tarmac also maintained a bonus plan for executives and certain key employees that provided a monthly bonus of a fixed percent of the employee's annual salary. The employee had only to meet minimum job performance standards to be eligible for the bonus. In the list of undisputed facts in its summary judgment motion, Tarmac asserts that the plan was discontinued as of the date of the sale to Titan.[3] The depositions and affidavits referenced in support of this fact indicate that the acquisition was completed on October 1, 2000, and that the Tarmac bonus plan ended effective September 30, 2000, with Titan instituting its own bonus plan for the last quarter of 2000.

On March 30, 2001, the plan administrator ("plan committee" or "committee"), a committee of Tarmac executives designated by the Board, delivered a written opinion on Fuqua's request for SERP contributions on his severance payments. The committee determined that the severance payments were not eligible for SERP contributions.

In his complaint, Fuqua claims that Tarmac failed to pay its percentage due under the SERP on the EGAR severance payments and that the decision of the committee denying the payments was in error. He also claims that Tarmac failed to pay the bonus due him for the month of October.

Tarmac argues that the committee's decision is entitled to deference and that, as

the severance payments were not payments "for services rendered," there is no SERP contribution due. As for the bonus, Tarmac argues that the bonus plan to which Fuqua refers ended with the Titan acquisition of Tarmac on October 1, 2000. Therefore, Fuqua is not due a bonus for October under that plan, as the plan had ceased to exist.

### Standard of Review

Summary judgment is appropriate when a court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). A party opposing a motion for summary judgment may not rest on the pleadings alone, but must instead show that "specific, material facts exist that give rise to a genuine triable issue." Hagan v. McNallen (In re McNallen), 62 F.3d 619, 623–24 (4th Cir.1995). In essence, the nonmovant must present evidence "on which a jury could reasonably find" for the nonmoving party. Anderson, 477 U.S. at 252, 106 S.Ct. 2505.

### Analysis

**I. Company Contributions to SERP Account on Severance Payment**

After receiving his severance payment under the EGAR, Fuqua requested that Tarmac pay an additional $107,678.25, its

---

**3.** Because Fuqua failed to respond to Tarmac's motion for summary judgment, the undisputed facts as set out in Tarmac's summary judgment motion are left uncontroverted. See Withers, 988 F.Supp. at 945; supra note 1. However, in the undisputed facts as asserted in his cross motion for summary judgment,

Fuqua fails to address the bonus plan, except to note the amount in contention. (Pl. Mot. Summ. J. at 9.) Therefore, even if the court were to take Fuqua's undisputed facts into account, the analysis on the issue of the bonus would not change.

contribution to the SERP account based on a percentage of the severance payment. The company took the position that there was no contribution owed, as under the SERP, it had agreed to make a contribution only for compensation given an employee "for services rendered." Fuqua then requested a formal determination regarding payment of the company contributions from the SERP's administrator, the plan committee. This committee, chaired by B. Edward Pittman, determined that the company did not owe the contribution.

The SERP states that the company will, "[o]n each December 31 and June 30," contribute "an amount equal to ten percent (10%) of such Participant's Compensation for the six-month period ending on such date," plus a gross-up equal to the amount of taxes that would be incurred on the ten percent (10%). (SERP § 3.2, attached as Ex. 1 to Mem. Supp. Def. Mot. Summ. J.) It defines "Compensation" as the "total amount of Salary, Bonus, and other payments made ... for services rendered to the Employer during the Plan Year." (SERP § 1.12, attached as Ex. 1 to Mem. Supp. Def. Mot. Summ. J.)

The EGAR was executed in anticipation of the sale of Tarmac's parent company. It was designed to provide a safety net for any executives who lost their jobs as a result of the change in control. It provided that if an executive was terminated without cause within eighteen (18) months of the sale of Tarmac, the executive would receive "cash compensation and benefits" including a severance payment equal to eighteen (18) months of pay at the rate of the executive's salary as of the date of the EGAR, the continuation of welfare benefits such as medical and life insurance, and up to $10,000 to cover executive outplacement services. (EGAR at 1–2, attached as Ex. 5 to Mem. Supp. Def. Mot. Summ. J.)

## A. Standard of Review for Plan Committee Decision

■ The parties dispute the appropriate standard of review under which the court evaluates the action of the plan committee. Fuqua argues for a *de novo* standard of review because of the nature of the plan, or in the alternative a more strict standard than abuse of discretion because he alleges that, as the plan committee members were all retained Tarmac executives, there is a conflict of interest. Tarmac argues for abuse of discretion as the standard of review, giving great deference to the decision of the plan committee.

The Supreme Court has stated that "a denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *See also Booth v. Wal–Mart Stores, Inc.,* 201 F.3d 335, 341–42 (4th Cir.2000)(setting out abuse of discretion as the appropriate standard of review of a discretionary decision by a plan administrator or fiduciary). The SERP at issue here states that the administrator has the authority "[t]o interpret the Plan" with the interpretation being "final and conclusive" and "[t]o decide all questions concerning the Plan and the eligibility of any person to participate in the Plan." (SERP 9.1(b), (c), attached as Ex. 1 to Mem. Supp. Def. Mot. Summ. J.)

■ Fuqua contends that as the ERISA plan at issue is an unfunded, top-hat plan[4],

---

4. Top-hat plans, as they have come to be known, are unfunded and designated for the specific purpose of "providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1).

the appropriate standard of review is *de novo*. Many of ERISA's rules and regulations do not apply to top-hat plans, including detailed accrual, vesting, funding, and fiduciary requirements; the enforcement provisions of § 1132(a) do, however, apply to these plans. *Denzler v. Questech, Inc.*, 80 F.3d 97, 99 n. 1 (4th Cir.1996). Fuqua cites to two cases in support of his proposition. He quotes the court in *Booth*, stating that "the standard for review . . . of a *fiduciary's* discretionary decision is . . . abuse of discretion." 201 F.3d at 342 (emphasis added). He contends that as the administrators of top-hat plans are not subject to ERISA's fiduciary requirements, the deferential standard of review is not available. Fuqua also cites to *Adelson v. GTE Corp.*, where the court states that "the decisions of plan administrators are entitled to deference because the plan administrators are fiduciaries." 790 F.Supp. 1265, 1270 (D.Md.1992). Fuqua then cites to a Third Circuit case holding that the deferential standard of review as set out in *Firestone* is not applicable to the decisions of top-hat plan administrators, as they are not fiduciaries. *See Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442–43 (3d Cir.2001).

Fuqua's analysis is misguided. First, the terms "administrator" and "fiduciary" are used interchangeably throughout the *Booth* opinion, with no distinction being made between the two. Second, Fuqua fails to note that even though the Third Circuit determined in *Goldstein* that the administrator was not entitled to the abuse of discretion standard under the *Firestone* holding, the court did not review the administrator's decision *de novo*. Rather, it found that under principles of contract law, the discretion granted to the administrator in the plan regarding interpretation was binding as a contract term, provided that the discretion was exercised in good faith. *Goldstein*, 251 F.3d at 443–47. Finally, the court in *Goldstein* also notes that other circuits have come to a different conclusion about the application of *Firestone* to top-hat plans. *Id.* at 443 n. 6.

Fuqua's interpretation of *Firestone* is incorrect for another reason, as Tarmac points out in its brief. In issuing its holding regarding the appropriate standard of review, the Court explained its application to various types of plans: "Because we do not rest our decision on the concern for impartiality that guided the Court of Appeals, we need not distinguish between types of plans or focus on the motivations of plan administrators and fiduciaries." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (citations omitted). The *Firestone* Court did provide, however, that if the administrator or fiduciary operates under a conflict of interest, that conflict "must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (citation omitted). The Fourth Circuit, in *Booth*, expanded upon this concept, indicating that a conflict could "operate to reduce the deference given to a discretionary decision" of an administrator "to the extent necessary to 'neutralize any untoward influence resulting from that conflict.'" *Booth*, 201 F.3d at 343 n. 2 (citations omitted). Fuqua argues that because the members of the plan committee are also Tarmac employees, the conflict of interest should effectively reduce the standard of review to *de novo*.

The Fourth Circuit has recently decided a case that seems best to set out the appropriate standard of review and the impact of a conflict of interest on that standard. In *Bynum v. Cigna Healthcare of N.C., Inc.*, the court addressed a plain conflict of interest, as the insurer was also the administrator of the plan. 287 F.3d 305, 312 (4th Cir.2002). The court stated that the "abuse of discretion standard remain[ed] applicable" but that the court

would " 'lessen the deference normally given under this standard of review ... to the extent necessary to counteract any influence unduly resulting from the conflict.' " *Id.* (quoting *Ellis v. Metro. Life Ins. Co.,* 126 F.3d 228, 233 (4th Cir.1997)). Given the lessening of deference, the court determined that the appropriate evaluation was whether the administrator's decision was "objectively reasonable." *Id.* at 312. The administrator's decision would be examined "to ensure that it [was] 'supported by substantial evidence,' and that it resulted from 'a deliberate, principled reasoning process.' " *Id.* at 313 (quoting *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997)).

The SERP defines the administrator as "the person or committee as may be appointed from time to time by the Board or if the Board so elects, the Board, to supervise the administration of the Plan." (SERP 1.2, attached as Ex. 1 to Mem. Supp. Def. Mot. Summ. J.) The committee members at the time of Fuqua's appeal for benefits were all Tarmac executives who survived the sale of the company. Fuqua asserts that, as these executives might fear that they, too, could be terminated, they were influenced by this fear in their denial of his benefits. Tarmac argues that there is no proof that the executives had any reason to fear for their jobs.

The fact that the employer itself administered the plan, even though it did so through appointment of employees, does set up a conflict of interest. The employer stood to gain if it did not have to pay SERP contributions on the severance packages of departing executives. Therefore, as the court in *Bynum* concluded, although abuse of discretion is the appropriate standard, the decision of the administrators, while receiving some deference, should be evaluated to assure that it is supported by substantial evidence and resulted from a deliberate, principled reasoning process. 287 F.3d at 313.

## B. Evaluation of Plan Committee Decision

Using the standard of review as set out above, the court will consider the process through which the plan committee arrived at its decision to deny SERP contributions on the severance payments. The court in *Booth* set out several factors that can be taken into consideration in assessing the plan committee's decision. These include 1) the language of the plan and its purposes and goals, 2) the adequacy of the materials utilized by the committee, 3) the consistency of this interpretation with other provisions and prior interpretations of the plan, 4) whether the process was reasoned and principled, 5) consistency with any ERISA requirements, 6) any external standard relevant to the exercise of discretion, and 7) motives of the committee and any conflict of interest that might exist. 201 F.3d at 342–43. An evaluation of the steps taken by the plan committee indicates that, giving even slight deference to the committee's interpretation of the plan, the decision is supported by substantial evidence, and the committee did engage in a deliberate process in arriving at the decision.

### 1. The Plan—Its Language, Purposes and Goals

The issue hinges around the interpretation of compensation as defined in the SERP. The plan defines compensation as the "total amount of Salary, Bonus, and other payments made ... for services rendered to the Employer during the Plan Year." (SERP § 1.12, attached as Ex. 1 to Mem. Supp. Def. Mot. Summ. J.) The plan committee determined from the language that the severance pay was not a payment for services rendered; therefore; it did not fall under the definition of compensation. The plan committee also looked to the Preamble of the SERP, which stated that the purpose of the plan was to provide

security for those "who have rendered and continue to render valuable services for their Employer." (SERP Preamble, attached as Ex. 1 to Mem. Supp. Def. Mot. Summ. J.) The committee therefore interpreted the SERP as intending to provide company contributions only for those participants who continued in employment with the company. Finally, the plan committee looked to the language of the EGAR, which provided the severance benefits. The EGAR was established to encourage executives to continue with the company through the transition by providing a generous cushion for them should they lose their jobs as a result of the sale. The committee decided that the severance benefits, which were to be paid only to those employees who left the company, were not payment for services rendered to the employer and therefore not compensation as defined in the SERP. The plan committee also contacted the parties involved in the drafting of the EGAR to ascertain whether the payment of SERP contributions on the severance payments was discussed and learned that it had not been.

### 2. Adequacy of the Materials Utilized by the Committee

The plan committee looked at two conflicting legal opinions on whether the SERP contributions should be paid on the severance pay. One opinion, which the committee sought from Robert Christenson, an attorney who specialized in employee benefits, concluded that the severance benefits were not compensation as defined in § 1.12 of the SERP. The second opinion, sought by Fuqua from John C. Bilzor, whose specialty areas include drafting transactional agreements and corporate and health law, reviewed the documents in question and the opinion rendered by Robert Christenson and concluded that the severance payment was compensation under the terms of the

agreement. In addition to these opinions, the committee considered, as explained above, the language of the SERP and the EGAR as well as the information received from a party involved in drafting the EGAR. Based on an evaluation of the materials reviewed by the committee, the court finds that the record before the committee was adequate.

### 3. Consistency with Other Provisions and Prior Interpretations

Tarmac asserts that the decision was consistent with other provisions of the plan, as explained in section 1 above. As for prior interpretations of the SERP, there were no formal prior interpretations upon which the committee could rely. The only prior SERP participant to depart with severance benefits was Bruce Smith, whose severance payment was not under the EGAR, as Fuqua's was. Smith did not receive SERP contributions on his severance payment, however, nor did he request them.

Fuqua counters that other Tarmac employees had severance agreements that permitted company pension and 401(k) contributions on the severance. He also asserts that the company did deduct his personal contribution to the SERP account from the severance pay.

Tarmac explains that the definition of compensation in these other plans was broader initially and was specifically amended effective December 1, 1999, to include severance pay as compensation. The 401(k) defines compensation as "taxable earnings as reported on Form W-2," (Tarmac 401(k) at 13, attached as Ex. 25 to Pl. Mem. Supp. Mot. Summ. J.), which is not similar to the SERP definition of compensation as the "total amount of Salary, Bonus, and other payments made ... for services rendered to the Employer during the Plan Year." (SERP § 1.12, attached as Ex. 1 to Mem. Supp. Def. Mot. Summ. J.)

As to the issue of Tarmac's deduction of Fuqua's contribution to the SERP, Fuqua, although making the assertion, fails to provide any evidence on the issue. In the Request for Admissions, Tarmac denies the admission regarding deduction of Fuqua's contribution. (Def. Resp. to Pl. Interrogs., Resp. to Req. for Admis. at 7, ¶ 19, attached as Ex. 32 to Pl. Mot. Summ. J.) In Fuqua's summary judgment motion, he cites only to his own testimony in support of this allegation. The issue as raised by Fuqua is insufficient to meet the burden placed upon him by the summary judgment standard, as he has failed to show that, regarding the deduction of personal SERP contributions, "specific, material facts exist that give rise to a genuine triable issue." *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619, 623–24 (4th Cir. 1995.)

### 4. Whether the Process was Reasoned and Principled

The plan committee evaluated the language of the plans and other materials, including outside legal opinions on whether SERP contributions were due on severance benefits. Fuqua had the opportunity to submit documents, as one legal opinion considered by the committee had been solicited by Fuqua. The committee then issued a written decision signed by all members explaining the reasons for its determination. (Plan Administrator's Decision, attached as Ex. 22 to Pl. Mot. Summ. J.) The decision that SERP contributions were not due was reasonable in light of the information and materials that were in front of the committee.

Fuqua argues that the outcome of the entire process was predetermined, as the committee was aware that the new owner and CEO opposed the payment of SERP contributions on the severance payments. Although this allegation must be weighed in determining the potential conflict of interest, it does not negate the fact that, under the materials presented to the committee, a reasonable person could determine that the SERP contributions—were not required on severance pay.

### 5. Consistency with ERISA Requirements

ERISA requires that plan participants be notified in writing of any benefit denial, and that they be given an opportunity for a full and fair hearing by those denying the claim. 29 U.S.C. § 1133. As explained above, the committee undertook its review of the question of SERP contributions on the severance payments upon Fuqua's request and accepted evidence from him in support of his position, issuing a written finding detailing the reasons for its denial at the conclusion of the evaluation. Therefore, ERISA requirements have been met.

### 6. External Standards Relevant to the Exercise of Discretion

Though the Fourth Circuit has not ruled in a case with similar facts, both Tarmac and Fuqua present case law to be evaluated under the external standards prong. Tarmac sites to *Mein v. Carus Corp.,* in which the Seventh Circuit evaluated an administrator's decision that settlement payments upon release from employment were not compensation and were not eligible for company contributions. 241 F.3d 581, 585–86 (7th Cir.2001). In the plan at issue in this case, compensation was defined as "the total of all amounts received ... for services rendered." *Id.* at 585. The court found that the administrator's decision was not unreasonable and affirmed judgment dismissing the complaint. *Id.* at 586.

Fuqua cites to a string of cases in which the plans at issue specifically excluded severance pay in the definition of compensation, arguing that it is "common practice"

for plans excluding severance pay to do so expressly. *See, e.g., Perreca v. Gluck,* 295 F.3d 215, 222 (2d cir.2002); *Gallo v. Amoco Corp.,* 102 F.3d 918, 920 (7th Cir.1996); *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.,* 37 F.3d 55, 56 (2d Cir.1994). The problem with these cites is that they do not address the issue at hand. The SERP does not specifically include or exclude severance pay, and neither party alleges that it does. The question under consideration is whether the plan committee's interpretation of the plan is reasonable. The cases cited by Fuqua do not bear on this question.

Fuqua's suggestion that the severance payments under the EGAR should be subject to company SERP contributions because other severance plans within the company are is misplaced for another reason. The nature of the SERP as a top-hat plan speaks to the executives' opportunity to negotiate the provisions that they desire. Top-hat plans are exempted from the substantive requirements of ERISA. They are so exempted "because 'Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan ... and, therefore, [do] not need the substantive rights and protections of Title I.' " *Carr v. First Nationwide Bank,* 816 F.Supp. 1476, 1491 (N.D.Ca.1993) (quoting U.S. Dep't of Labor ERISA Op. 90–14A). The EGAR was negotiated in an effort to retain important executives, who would have had leverage at that time to negotiate at least some of the terms of the agreement. The executives did not, for whatever reason, negotiate for SERP contributions on the severance pay, despite this opportunity.

Fuqua next cites to *Luczkovich v. Luczkovich* as a case in which severance pay was found to be deferred compensation for

services rendered. 26 Va.App. 702, 496 S.E.2d 157 (1998). He asserts that "[t]here was never any question that benefits under the Severance Agreement were compensation for services rendered." (Pl. Mot. Summ. J. at 18.) This characterization is misleading. In *Luczkovich,* the court evaluated whether benefits received by the husband from a severance agreement were marital property. The wife argued that the severance package was intended as compensation for services rendered during the marriage, even though the agreement was negotiated almost two years after the separation of the spouses. *Id.* at 710–11, 496 S.E.2d 157. This agreement was negotiated in contemplation of the sale of the company and was intended to encourage the husband to remain with the company pending the sale. *Id.* The court found that, as the benefit did not vest until the sale of the company, its purpose was related to that sale rather than to compensating the husband for services rendered to the company while he and his wife were together. *Id.* The court did not, contrary to Fuqua's assertion, find that the severance payments were compensation for services rendered.

Based on the cases presented and the analysis of the function of such plans, the external standards are at best neutral, and could even be interpreted as weighing in favor of Tarmac.

### 7. Motives of The Committee and Conflicts of Interest

As previously discussed, Fuqua alleges that the committee members operated under a conflict of interest. He asserts that the plan committee members, Tarmac executives who had seen fellow executives lose their jobs, operated under fear of being terminated. Because the plan is administered by the employer, there is a potential, if not an actual, conflict of interest. The mere fact that there is a conflict of interest does not render the decision

invalid, however. As acknowledged in the prior discussion of the conflict of interest as it weighed on the standard of review, the court evaluates the committee decision with the conflict in mind, by utilizing the factors recited and assuring that there is substantial evidence to support the committee's decision. This evaluation factors in the conflict, and gives it due consideration. Therefore, this factor need not be addressed further.

## C. Summary

After evaluating the steps taken by the plan committee under the criteria as set out in *Booth*, the court concludes that the committee's decision, if given even slight deference, is supported by substantial evidence, and that the committee did engage in a deliberate process in arriving at the decision. Under the abuse of discretion standard, and with the conflict of interest factored in, the court finds that defendants are entitled to summary judgment as to the issue of SERP contributions on the severance payments.

## II. Bonus Payment

Fuqua's second claim is that Tarmac owes him a bonus for the month of October, 2000, the last month in which he worked for the company. In the list of undisputed facts in its summary judgment motion, Tarmac asserts that the bonus plan to which Fuqua refers was discontinued as of the date of the sale to Titan.[5] (Mem. Supp. Def. Mot. Summ. J. at 5.) The depositions and affidavits provided indicate that the acquisition was completed on October 1, 2000, with the Tarmac bonus plan ended effective September 30, 2000, and Titan instituting its own bonus plan for the last quarter of 2000. (Wilt Aff. at ¶¶ 3, 4, attached as Ex. 3 to Mem. Supp. Def. Mot. Summ. J.) Furthermore, Fuqua provides no documentary or other evidence regarding either bonus plan, thus failing to establish a genuine issue of material fact. Therefore, Tarmac is entitled to summary judgment on the issue of the bonus.

## Conclusion

For the reasons stated above, the court **GRANTS** defendants' motion for summary judgment and **DENIES** plaintiff's motion for summary judgment. The Clerk shall enter judgment for defendants.

The Clerk is **DIRECTED** to forward copies of this Opinion to counsel for all parties.

**IT IS SO ORDERED.**

---

**5.** *See supra* note 2 regarding undisputed facts   in analysis of the bonus.