**T. Sam SCIPIO, Jr., Plaintiff,**

**v.**

**UNITED NATIONAL BANKSHARES, INC., d/b/a United National Bank, Defendant.**

**No. CIV.A.1:01 CV 175.**

United States District Court, N.D. West Virginia.

Sept. 26, 2003.

William J. Yaeger, Jr., Esquire, Herndon, Morton, Herndon & & Yeager, Wheeling, WV, Donald M. Kresen, Esquire, Gold, Khourey & Turak, LC, Moundsville, WV, for Plaintiff T. Sam Scipio, Jr.

Charles T. Berry, Esquire, Bowles, Rice, McDavid, Graff & Love PLLC, Morgantown, WV, for defendant United Bancshares, Inc.

## MEMORANDUM OPINION AND ORDER

KEELEY, District Judge.

Before the Court are: (1) the Plaintiff's Motion for Summary Judgment; (2) the Plaintiff's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses; and (3) the Defendant's Motion for Summary Judgment. The motions are fully briefed and ripe for review. For the following reasons, the Court **DENIES** both of the plaintiff's motions and **GRANTS** the defendant's motion.

### I. BACKGROUND

On June 27, 1977, plaintiff T. Sam Scipio, Jr. (Scipio) began working for First Empire Federal Savings and Loan (First Empire). In 1988, First Empire purchased Eagle Bancorp, Inc. (Eagle) and entered into employment agreements with many key employees. Scipio, having risen

to the position of "Senior Vice President—Lending and Secretary of the Employers," was one of those key employees, and, in October 1988, he signed his employment agreement (the EA) with First Empire. At the same time, he also entered into both a Non–Qualified Retirement Plan for Executives (the Plan) and a Non–Qualified Stock Option Agreement (the SOA). Under the SOA, Scipio received a number of options on Eagle common stock.

On October 20, 1993, Scipio exercised his option on 20,000 split-adjusted shares of Eagle common stock. According to the terms of the SOA, Scipio "recognize[d] ordinary income in an amount equal to the excess of the fair market value of the shares on the date of the exercise . . . over the exercise price," and First Empire took a tax deduction in the same amount for that fiscal year. Accordingly, Scipio's 1993 IRS Form W–2 listed wages of $496,933.65, which included the $408,000.00 he recognized on the option transaction.

In 1996, defendant United National Bankshares (United) acquired and merged with Eagle and First Empire, leaving United as the only surviving entity. Scipio automatically became a United employee with a new title and new responsibilities.

This change occurred without Scipio's written consent, and, consequently, he found himself with "good cause" under the EA to terminate his employment while still retaining full retirement benefits.

On November 5, 1996, Scipio sent his notice of termination to United. Scipio also sent a memorandum requesting, among other things, a calculation of retirement benefits that were due to him.

The Plan permits an executive to retire early and receive an annual pension that is paid in monthly installments for the rest of his life.[1] The Plan sets the annual pension at 70%[2] of the executive's "Final Average Earnings," which is an average of the highest five consecutive years of annual earnings in the ten years immediately preceding the executive's retirement date.[3] The Plan defines "Earnings" as "the total earnings received from the Employers during a calendar year, excluding any specific bonuses which the Board of Directors stipulates as excluded for purposes of this Plan." (Plan, § 2.8).

Based on the foregoing, in his November 5, 1996 memorandum, Scipio suggested that his "Earnings" for the ten consecutive years preceding his Early Retirement Date[4] were:

1. "If an Executive retires on an Early Retirement Date, he or she shall be entitled to an annual pension commencing at such Early Retirement Date computed in accordance with Section 3.1 but based on his or her Final Average Earnings and Years of Service at such Early Retirement Date. Such annual pension shall be payable in monthly installments for the life of the Executive." (Plan, § 3.2).

2. "If an Executive retires on or after Normal Retirement date, he or she will be entitled to receive an annual pension from the Employers equal to . . . 70% of Final Average Earnings . . . ." (Plan, § 3.1).

3. "*Final Average Earnings* shall mean the average of the highest five consecutive calendar years of annual Earnings received by an Executive from the Employers during the calendar year of retirement and the nine calendar years prior to the Executive's Early Retirement Date, Normal Retirement Date or Deferred Retirement Date, whichever is applicable. Earnings in the year of retirement are annualized and treated as calendar year earnings for this purpose." (Plan, § 2.10).

4. The "Early Retirement Date" under the Plan is "the first day of any month on which an Executive attains age 55 and has completed ten Years of Service." (Plan, § 2.7). Scipio tendered his resignation before he reached the age of 55. Therefore, his salary for his final actual year of service was annualized, and then applied to all subsequent years until his 55th birthday (which apparently occurred in 1999).

1990: $ 67,744.00
1991: $ 67,630.00
1992: $ 79,043.95
1993: $496,933.65
1994: $101,008.13
1995: $101,419.13
1996: Annualized Earnings for 1996
1997: " "
1998: " "
1999: " "

On November 20, 1996, United sent Scipio a letter accepting his resignation. United stated that it would forward Scipio's request for the calculation of his retirement benefits to United's benefits consultant, and assured him that it would notify him of the results as soon as they became available.

What United did not say in its November 20 letter was that Scipio's suggested 1993 "Earnings" had raised some eyebrows on the Pension Committee,[5] which did some investigation and quickly discovered that the enormous difference between Scipio's suggested 1993 earnings and that for the other years was due to his inclusion of the $408,000 realized from his stock option transaction. Normally, the Pension Committee only considered an employee's salary as "Earnings" for purposes of calculating retirement benefits under the Plan.[6] Scipio's numbers, however, suggested a problem, and the Pension Committee set

to work to determine if its understanding of the Plan term "Earnings" was incorrect.

The Pension Committee assigned this task to Joseph Sowards, a committee member and a United Executive Vice-President. He first contacted William Wagner, former CEO and Chairman of the Board of Directors for First Empire and Eagle when the Plan was created, to ask him if amounts realized from the exercise of stock options granted to First Empire executives under the SOA were to be included as "Earnings" under the Plan. Wagner, who was involved in the development, revision and implementation of the Plan and the SOA, told Soward that the Plan was designed to ensure that executives received a retirement benefit of at least 70% of their typical annual salary. He also stated that the drafters of the Plan never intended "Earnings" to include any gain or realization from the exercise of stock options, and the retirement benefit should not be based upon a calculation that included such gain.

Sowards then contacted outside counsel Lesley Russo and asked her to determine whether the Pension Committee's position was contrary to the Plan language or any applicable law. Ms. Russo opined that it was not.

**5.** Section 6.1 of the Plan designates the Board of Directors as the Plan Administrator. The evidence in the record suggests, but does not conclusively prove, that the Board delegated its authority in this area to the Pension Committee. In any case, the parties agree that there is a Plan Administrator, no matter what name it goes by. Therefore, the Court uses the terms "Plan Administrator" or "Pension Committee" interchangeably to refer to the body that administers United's benefit plans.

**6.** The defendants have submitted the affidavit of Cindy McGhee, former Controller of First Empire and Eagle and current Senior Vice President of Trust Administration for United. Ms. McGhee states she has never understood

the definition of "Earnings" under the Plan to include "any gain or realization from the exercise of stock options. As Controller, my understanding right from the very beginning as confirmed by the Chief Financial Officer, was that the supplemental retirement benefit calculations were not based upon any taxable gain someone might have from exercising stock options." Ms. McGhee also stated that she had worked on the benefit calculations for two other similarly situated executives (who had exercised their stock options within the 10 year window preceding their retirement date), and she did not use the gains they realized from their option transactions in the calculation of their benefits.

The Pension Committee also hired Aon Consulting to perform Scipio's benefits calculation. Aon performed the calculation without including the $408,000 stock-option gain as "Earnings."

On February 4, 1997, after all of this had been completed and the Pension Committee felt certain that its long-held position on the Plan's definition of "Earnings" was justified, it adopted a resolution approving Aon's calculation of Scipio's benefits and formally excluding from the Plan's definition of "Earnings" any amounts realized due to the exercise of non-qualified stock options.

United informed Scipio of his retirement benefit calculation in a letter dated February 19, 1997. United indicated that the work had been performed by Aon, and that the Pension Committee had approved the calculation. The letter then set forth, in detail, how Aon performed the benefit calculation. With respect to Scipio's non-qualified benefit under the Plan, the description of the calculation stated:

> Final Average Pay for [the Plan] is different than the Qualified plan. It assumes you continue to make your final year's rate of pay up until you are eligible for early retirement. The pay rate for the year of termination is included in the average.
>
> | | |
> |---|---|
> | 1999 | 106,209.36 |
> | 1998 | 106,209.36 |
> | 1997 | 106,209.36 |
> | 1996 | 106,209.36 |
> | 1995 | 101,419.13 |
> | Final Average Pay (NQ) | 105,251.31 |

On March 27, 1997, Scipio objected to United's calculation of his "Final Average Earnings." He insisted that the proper five-consecutive-year period was 1993–1997, and not the 1995–1999 period used by United. Scipio acknowledged that his 1993 income was not based on salary alone, but included both his salary and the gain realized from his exercise of his stock options under the SOA. Scipio pointed out, however, that the Plan's definition of "Earnings" was unclear, and insisted that the term should be interpreted expansively, as it is in Black's Law Dictionary ("That which is earned, i.e., money earned from performance of labor, services, sale of goods, etc. Term is broader in meaning than 'wages.'"). Therefore, according to Scipio, everything on his W–2 Form for a given year should have been considered when determining his "Earnings." He contended the years 1993–1997 should have been used to calculate his "Final Average Earnings" because the $496,933.65 stated on his 1993 W–2, combined with his salaries for the four following years, yields a higher five-year average than the period of 1995–1999.

On April 7, 1997, United responded with a much more detailed explanation of its choice of the 1995–1999 period for calculating Scipio's "Final Average Earnings." While acknowledging that the Plan contained an unclear definition of "Earnings," United nevertheless disagreed with Scipio's choice of authority to clear up the ambiguity. Instead of turning to a dictionary, United looked for guidance in the Internal Revenue Code and corresponding regulations governing "qualified" benefit plans.[7] It informed Scipio that the income he recognized on the 1993 stock option transaction was not included in "Earnings" for purposes of his benefits calculation because 26 C.F.R. §§ 1.415–2(d)(1) and (d)(3)(ii), the IRS' detailed definition of "compensation" for such plans, specifically excludes such sums.

---

7. United looked to Treasury Regulations explaining 26 U.S.C. § 415, which sets standards for "qualified" benefit plans. Such plans are "qualified" if they follow the standards; following the standards affords the plans special tax treatment. These regulations are discussed in detail later in this opinion and are therefore not quoted in full here.

United further stated that the Plan Administrator had uniformly applied this definition of "Earnings" when it considered the benefits payable to Scipio and other retirees. Finally, United reminded Scipio of section 6.1 of the Plan, which vests the Plan Administrator with the discretion "to determine benefit rights . . . in accordance with uniform standards, [and answer] any question arising in the administration, interpretation and application of the [Plan], [with] such determination to be conclusive and binding to the extent that the same shall not be plainly inconsistent with the terms of the [Plan] or any applicable law." The Committee made this determination "prior to forwarding the benefits calculations to the participants in February, 1997."

Scipio did not accept United's position, and mailed more written objections reiterating his position. United responded twice, each time noting that Scipio had not presented any new evidence or argument, and stating that it stood by its decision.[8]

On September 1, 1999, Scipio notified United by certified mail that he was 55 and that he wished to receive his retirement benefits. United began paying Scipio's retirement benefit according to its previous calculation. Scipio then brought this civil action to challenge the Plan Administrator's decision to exclude his $408,000 stock option gain from that calculation.

---

**8.** The record does not contain Scipio's additional letters, but each of United's responses, which are included in the record, reference such letters.

**9.** "Top Hat" plans are unfunded (the employer does not set aside special funds to cover benefits payable under the plan) and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly com-

## II. ANALYSIS

This case turns on the interpretation of the Plan term "Earnings." United National argues that the Court should not disturb the reasonable definition its Plan Administrator assigned the term, which excludes sums that an executive receives from the exercise of non-qualified stock options. Scipio, on the other hand, contends that "Earnings" has a plain and expansive meaning, and the Plan Administrator acted unreasonably and arbitrarily when it chose to exclude his 1993 stock option gains from his "Earnings" for that year.

■ The parties do not dispute any material facts, and they agree that Federal Rule of Civil Procedure 56 requires the Court to decide which party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c) (Summary judgment is appropriate when "there is no genuine issue as to any material fact, and . . . the moving party is entitled to a judgment as a matter of law."). The parties also agree that the Executive Plan is a "Top Hat" plan,[9] and that the civil enforcement provision of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), governs this case.

The parties' disagreements begin with the proper standard of review.

### A. Determining the Standard of Review

■ The United States Supreme Court established the procedure for determining the standard of review in cases

---

pensated employees. *Denzler v. Questech, Inc.*, 80 F.3d 97, 100 n. 1 (4th Cir.1996); *see also Fuqua v. Tarmac of America, Inc.*, 228 F.Supp.2d 755 (E.D.Va.2002). Top Hat plans are subject to the Employee Benefit Retirement Income Security Act's (ERISA) enforcement provisions, even though "many [of ERISA's] rules and protections [do] not apply to Top Hat plans." *Denzler*, 80 F.3d at 100 n. 1.

brought pursuant to 29 U.S.C. § 1132(a)(1)(B) in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). According to *Firestone,* a court should examine the plan language to determine whether it grants the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. If the plan does not grant the administrator discretion, a court should review the plaintiff's claim *de novo,* construing the plan as it would any other contract. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Booth,* 201 F.3d at 340–41. If the administrator does have discretion, then the Court reviews its decision for an abuse of discretion. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Booth,* 201 F.3d at 341.

In this case, section 6.1(e) of the Plan states:

> The Board of Directors of the Association shall serve as Plan Administrator. The Plan Administrator of the Plan shall have the following powers and responsibilities ... [t]o determine, in accordance, with uniform standards, any question arising in the administration, interpretation and application of the plan, such determination to be conclusive and binding to the extent the same shall not be plainly inconsistent with the terms of the Plan or any applicable law.

Thus, the Plan grants the Plan Administrator the discretion to interpret ambiguous terms of the Plan.

Scipio contends that the meaning of the term "Earnings" in the Plan is plain and, therefore, the Court should review his claim *de novo.* United National takes the opposite position, arguing that the term, at best, is ambiguous, and this ambiguity grants the Plan Administrator the discretion to devise a reasonable definition that is consistent with the Plan language and any applicable law.

The Plan does attempt to define the term at Section 2.8:

> *Earnings* shall mean the total earnings received from the Employers during a calendar year, excluding any specific bonuses which the Board of Directors stipulates as excluded for purposes of this Plan.

Unfortunately, this is a circular definition, using the word "earnings" to define the term "Earnings." Thus, it provides no guidance at all, and, despite its trappings as a defined term, the Court concludes that the term "earnings" is undefined and ambiguous.

Because the Plan grants the Plan Administrator the discretion to define and interpret ambiguous terms, and because the Plan's effort to define "Earnings" fails, the Plan Administrator had the discretion to define and interpret that term in Scipio's case. Thus, the Court will review the Plan Administrator's decision for an abuse of discretion.[10]

---

**10.** Citing *Goldstein v. Johnson & Johnson,* 251 F.3d 433 (3rd Cir.2001), Scipio argues that the Executive Plan's classification as a "Top Hat" plan requires the Court to review the Plan Administrator's decision *de novo.* The *Goldstein* court determined that Top Hat plans, which are typically available only to highly sophisticated business executives, are a "unique animal ... more akin to unilateral contracts than to the trust-like structures normally found in ERISA plans," and decided that this unique status makes the *Firestone*

rule inapplicable. *Id.* at 442–3. The Supreme Court stated in *Firestone,* however, that "we do not rest our decision on the concern for impartiality that guided the Court of Appeals, [and] we need not distinguish between types of plans or focus on the motivations of plan administrators and fiduciaries." 489 U.S. at 115, 109 S.Ct. 948. Therefore, this Court will follow *Firestone* and not the Third Circuit. *See also Fuqua v. Tarmac of America, Inc.,* 228 F.Supp.2d 755, 759 (E.D.Va.2002) (similarly rejecting *Goldstein* ).

## B. Abuse of Discretion

■ Under an abuse of discretion standard, "the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." *Ellis v. Met. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir.1997); *see also Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305, 312 (4th Cir.2002) (same); *Booth*, 201 F.3d at 341 (same). The administrator's decision "is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis*, 126 F.3d at 232 (internal quotation marks omitted).

■ The Fourth Circuit has enunciated eight factors that a court may consider when determining the reasonableness of an administrator's decision: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Booth*, 201 F.3d at 342–3. While a district court may consider any additional factors it deems relevant, it also need not consider any of the eight that the parties do not implicate through their arguments. *Id.* at 344.

The parties' briefs implicate the first, second, third, fourth, fifth and eighth factors. The Court will address each factor separately; however, because the eighth factor can alter the standard of review, it shall review the issue of conflict of interest first.

### 1. Conflict of Interest

Scipio argues that the Court should not defer to the Plan Administrator's determination because it operated under a conflict of interest. He states:

Because the Plan is an unfunded plan, any benefits payable under the plan are made directly by the Defendant. Consequently, the Defendant has a significant incentive, a financial self interest, in limiting the definition of "earnings" as much as possible to reduce the amounts payable as benefits under the plan. As alleged in the Complaint, it is the position of the Plaintiff that the Defendant has understated Plaintiff's benefits under the Plan by $74,723.87 per year over the Plaintiff's life, resulting in an underpayment of $2,137,102.60 over the Plaintiff's expected life. Therefore, the Defendant's conflict is real, immediate and substantial.

(Plaintiff's MSJ at 8).

Although Scipio fails to cite it, there is support in the case law of the Fourth Circuit for his position. In *John Doe v. Group Hospitalization, d/b/a Blue Cross and Blue Shield*, 3 F.3d 80 (4th Cir.1993), the plaintiffs filed suit after the defendants denied their request for medical benefits. The defendants structured the plan at issue so that the only source of available funds to pay claims was the pool of collected premiums. *Id.* at 82–86. If the defendant's claim payments exceeded the actuarial norm, it had to make up the difference from its own assets. The *Doe* court held that the administrator operated under a "substantial conflict of interest" because the defendant's fixed-premium system encouraged the administrator to deny claims in order to enhance its own profits. *Id.* at 87.

In making this decision, the Fourth Circuit relied on *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir.1990), which recognized a "perpetual conflict" in unfunded plans where the administrator must choose between paying a higher benefit or enhancing the company's bottom line. The Fourth Circuit also distinguished its holding in *de Nobel v. Vitro Corp.*, 885 F.2d 1180 (4th Cir.1989), noting that, in that case, the retirement benefit came from a funded plan, and that decisions to pay on funded plans only adversely impact the fund, but not the company itself.

In this case, the parties agree that the Plan is an unfunded plan, and any payments come from United's own assets. Therefore, whenever the Plan Administrator is asked to pay a higher retirement benefit, that request could negatively impact United's finances. Theoretically, the Plan Administrator could harbor a desire to improve United's bottom line by limiting executive benefit payouts. This is a conflict of interest.

▮ In light of this conflict of interest, Scipio asks the Court to "total[ly] eliminat[e][the] deference afforded the Defendant." (Plaintiff's MSJ at 9). It is true that, when there is a conflict of interest, the Court must "lessen the deference normally given under this standard of review ... to the extent necessary to counteract any influence unduly resulting from the conflict." *Bynum*, 287 F.3d at 312 (quoting *Ellis*, 126 F.3d at 233).

An automatic adjustment to a near-*de novo* standard of review, however, is not the correct approach. Instead, "the greater the 'incentive for the [plan] administrator ... to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator['s] ... decision must be and the more substantial the evidence must be to support it.'" *Bynum*, 287 F.3d at 311 (quoting *Ellis*, 126 F.3d at 234). Furthermore, "when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interest of the fiduciary, [the court should] not act as deferentially as would otherwise be appropriate." *Doe*, 3 F.3d at 87.[11]

It is worth noting that Scipio seeks an annual retirement pension that is nearly $50,000 more than the highest annual salary he ever earned in his entire career with United. He justifies this windfall by assuming he should be further rewarded for one apparently well-timed stock transaction. He could just as easily have made a smaller or larger gain, or even have suffered a loss. And, while this timing may have required some skill, it was not skill exercised for United's benefit; indeed, United paid Scipio $408,000 over his salary that year.

While United stood to lose money if it adopted Scipio's definition of "Earnings," that definition implies a benefit that not only defies common sense, but also is not endorsed by the Fourth Circuit. *See Hickey v. Digital Equip. Corp.*, 43 F.3d

---

11. The parties agree that, under its interpretation of "Earnings," United can save over $70,000 a year and a total of more than $2,000,000. Although, initially, this seems like a lot of money, Scipio has failed to put this amount in the proper context. The level of the potential conflict can be more accurately ascertained by determining how the potential loss affects United's actual bottom line.

Put another way, although a payment of two million dollars over the course of his retirement might be a lot to Scipio, it might not be as much to United. Furthermore, the value to United might be further diminished by the fact that Scipio intends to receive it in installments over thirty years. Scipio has not addressed these issues.

941, 948 (4th Cir.1995) ("Courts have not looked favorably at ... windfall recoveries.") (collecting additional cases).

Therefore, the Court will review the Plan Administrator's decision in this case mindful of the Administrator's conflict of interest, and will uphold the decision only if it is objectively reasonable and supported by substantial evidence.

### 2. Plan Language

Scipio argues that the Plan's plain language required the Plan Administrator to include his gain from the stock option transaction as "Earnings." The only language Scipio focuses on, however, is the word "earnings." As already noted, the definition of the Plan term "Earnings" is circular and, therefore, without meaning.

Accordingly, this factor does not weigh for or against a finding that the Plan Administrator's decision was reasonable.

### 3. Purposes and Goals of the Plan

United has submitted affidavits supporting its position that the term "Earnings" was not intended to include an executive's gains from stock option transactions.

Lawrence Crimmins, Jr. is a former CFO, member of the Board of Directors and Treasurer of Eagle and First Empire. He was responsible for overseeing all of Eagle and First Empire's financial matters, including, according to his affidavit, accounting and financial reporting for the Plan and SOA. As CFO, he provided all necessary information to the actuary for calculating the potential liability for benefits under the Plan, and that calculation was included in a footnote in the Annual Report. From the time when the Plan and the SOA were implemented, until the time United bought Empire and First Eagle, he would submit this information with the understanding that the term "Earnings" did not to include any gain or realization from the exercise of stock options.

Paul Winter, former member of the First Empire Board of Directors and Executive Committee, voted to approve the Plan and the SOA. In his affidavit, he stated that his understanding was "the supplemental retirement benefits under the [Plan] were to be based upon annual cash payments to the executives ... [and that] 'earnings' under the [Plan] did not include [any] gain from someone exercising the stock option."

William Wagner, former CEO and Chairman of the Board of Directors for First Empire and Eagle, was also involved in the development, revision and implementation of the Plan and the SOA. In his affidavit, he stated that, "[i]n setting up the [Plan,] the intention was to provide supplemental retirement benefits based upon the usual cash payments made to the executives to ensure that their retirement benefits would equal at least seventy percent of what they were typically being paid in a year. The definition of 'Earnings' in the [Plan] never was to include any gain or realization from the exercise of stock options granted under the Stock Option Plan and the retirement benefit under the [Plan] was not to be based upon a calculation which would include any such gain."

Cindy McGhee, former controller and current Senior Vice President of Trust Administration for United, stated that she never understood the definition of "Earnings" under the Plan to include "any gain or realization from the exercise of stock options." Nor had she ever used the gains realized from stock option transactions when calculating the benefits of other executives similarly situated to Scipio.

Scipio, on the other hand, offers only the affidavit of J. Christoper Thomas, former president, COO and member of the Board of Directors of First Empire and Eagle between 1985 and 1996. Mr. Thomas admitted that he neither drafted nor re-

viewed the Plan or the SOA; however, he knew that both were approved by the Board of Directors. He stated that "[t]here was never any specific discussion among the Boards of Directors regarding the use of 'earnings' in the benefits calculation selection of the plan rather than the term 'compensation' or any other term." Furthermore, "[t]here were never any discussions with me or among the Boards of Directors regarding the exclusion of income from the exercise of non-qualified stock options from 'earnings' under the Plan when the Plan was established." Finally, he stated "it was not my understanding that the income from the exercise of non-qualified stock options would be excluded from the calculation of benefits under the Top Hat Plan or SERP." Mr. Thomas's affidavit fails to disclose, however, the specific basis for this understanding.

United's affiants participated in the drafting of the Plan and articulate a very concrete understanding about the intended purpose of that Plan and what sums were to be included as "Earnings." They were involved either in its development and approval or its implementation. Scipio's affiant, on the other hand, was not involved in the drafting of the Plan, and does not recall any discussions relevant to the issue in this case. Thus, even when viewed in the light most favorable to him, Scipio fails to raise a question of material fact. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)

("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to overcome a motion for summary judgment.)

The evidence in the record regarding the purposes and goals of the Plan weighs in favor of a finding that the Plan Administrator's decision was reasonable.

### 4. The Adequacy of the Materials Considered to Make the Decision and the Degree to which they Support It

The record demonstrates that the Plan Administrator's decision was based on three things: (1) United's long-held common understanding of the term's meaning; (2) the fact that United had consistently paid benefits and calculated its retirement benefit liabilities for its annual report in accordance with that understanding; and (3) confirmation of a similar definition used by the IRS.

The first two bases for the decision can be summed up as long experience. Because United correctly anticipated that unexamined experience can be fraught with mistaken assumptions, possibly making it unreliable, it called its attorney to investigate its long-standing interpretation of the term "Earnings." Ms. Russo found support for United's understanding in the Tax Code and corresponding regulations. The Code's sheer volume strongly suggests that the Internal Revenue Service, when it chooses to address an issue, does so thoroughly. In this case, United has uncovered highly relevant authority in support of its position.[12]

---

**12.** Scipio suggests that United engaged in a protracted search of the Tax Code and regulations to find a definition of "earnings" (or "compensation") that suited its purposes, and the presumed effort required to find these sections indicates bad faith on United's part. It is true that the Tax Code is voluminous, but it contains one portion addressing benefit plans and one definition of "compensation" in that context. The corresponding regulations are numbered consistently with the sec-

tions of the code, and, while voluminous themselves, are presented in a format that is easily navigable and understood by a competent attorney.

Although there is no evidence in the record supporting a conclusion that Ms. Russo happened upon the relevant regulations quickly, Scipio presents none that she did not. In any event, the Tax Code is a relevant authority, and it makes sense that an attorney would

The Treasury Regulations on which United relies are topical in that they define "compensation"[13] in the context of benefit plans. The fact that they do so with respect to "qualified" benefit plans and not "non-qualified" benefit plans is an immaterial distinction; however, qualified benefit plans differ from non-qualified benefit plans only in that the non-qualified plans do not receive special tax treatment from the Internal Revenue Service. 26 U.S.C. § 401, *et seq.* Otherwise, with respect to this case, qualified plans and non-qualified plans are similar in that they both determine the participant's benefit by calculating a percentage of some average level of the participant's annual earnings/compensation/income.

Title 26, section 1.415–2(d) of the Code of Federal Regulations clarifies the definition of "compensation" found in 26 U.S.C. § 415(c)(3), which sets forth limitations on benefits and contributions for qualified benefit plans under the Tax Code. The United States Code defines "compensation" as "the compensation of the participant from the employer for the year." 26 U.S.C. § 415(c)(3)(A). The regulation helps clear up the ambiguity of this circular definition by providing lists of includible and excludible forms of remuneration. The default rule is 26 C.F.R. § 1.415–2(d), and 26 C.F.R. § 1.415–2(d)(3)(ii) is the portion that excludes from that definition "[a]mounts realized from the exercise of a non-qualified stock option."

Section 1.415–2(d)(11) provides two exceptions to the default rule:

*Alternative definition of compensation.* In lieu of defining compensation in accordance with paragraphs (d)(2) and (d)(3) of this section, for purposes of applying the limitations of section 415 in the case of employees other than self-employed individuals treated as employees within the meaning of section 401(c)(1), a plan may define compensation using either of the following definitions used for wage reporting purposes, as modified herein, and the definition will be considered automatically to satisfy section 415(c)(3):

(i) Information required to be reported under sections 6041, 6051 and 6052. Compensation is defined as wages within the meaning of section 3401(a) and all other payments of compensation to an employee by his employer (in the course of the employer's trade or business) for which the employer is required to furnish the employee a written statement under sections 6041(d), 6051(a)(3), and 6052. See §§ 1.6041–1(a), 1.6041–2(a)(1), 1.6052–1, and 1.6052–2, and also see § 31.6051–1(a)(1)(i)(C) of this chapter. This definition of compensation may be modified to exclude amounts paid or reimbursed by the employer for moving expenses incurred by an employee, but only to the extent that at the time of the payment it is reasonable to believe that these amounts are deductible by the employee under section 217. Compensation under this paragraph (d)(11)(i) must be determined without regard to any rules under section 3401(a) that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in section 3401(a)(2)).

---

regularly look to it when investigating the legality of an administrator's decision.

**13.** Scipio argues that United's substitution of "compensation" for "earnings" was unreasonable. The Court disagrees. The two are synonyms. *See Roget's College Thesaurus* at 87–88 (rev. ed.1985) ("compensation" referring to "payment"); *id.* at 173 ("earnings" referring to "payment"). Also, as discussed above, the tax regulation is otherwise helpful.

(ii) Section 3401(a) wages. Compensation is defined as wages within the meaning of section 3401(a) (for purposes of income tax withholding at the source) but determined without regard to any rules that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in section 3401(a)(2)).

Scipio correctly argues that both of these exceptions allow the inclusion of income gained from the exercise of stock options as "compensation." The phrase "a plan may define compensation using either of the following definitions," however, limits the applicability of these alternative definitions. The plan—not the plan administrator after the fact—may use this definition.

Moreover, these are alternative, subordinate definitions. The Plan Administrator was looking for support for its long-held interpretation of the term "Earnings." Its outside counsel presented it with three definitions—a default rule and two exceptions. Where a default rule supports the Plan Administrator's decision, it need not change its position simply because there are alternate, less-favored definitions that might work.

Although he does not state it directly, Scipio's argument suggests that the Plan Administrator's failure to consider certain items undermines the adequacy of the materials it did consider.

First, Scipio repeatedly refers to the plain or ordinary meaning of "earnings." This suggests that he would have liked the Plan Administrator to consult a dictionary.

When the meaning of a word is in question, the dictionary can be a good place to start. *Cf. Amoco Prod. Co. v. Southern Ute Indian Tribe,* 526 U.S. 865, 874, 119 S.Ct. 1719, 144 L.Ed.2d 22 (1999) (United States Supreme Court using the dictionary to define statutory terms).

Webster defines "earnings" as "something earned, esp.: a. Salary or wages. b. Business profits. c. Investment gains." *Webster's II New College Dictionary* 354 (3d ed.1995). "Earn" means "to gain esp. for the performance of service or work." *Id.* These definitions can support either party's position. On one hand, they specifically mention investment gains, which is exactly what Scipio seeks to add to his "Earnings" under the Plan. On the other hand, the definitions suggest that the "earnings" must be paid for work performed for a third party. As discussed in the "Conflict of Interest" section above, Scipio did not receive his $408,000 for anything he did for his employer.

In this case, the dictionary provides little help, and United did not err if it failed to rely on it.

Scipio also argues that the Plan Administrator should have credited the full amount listed on his 1993 "IRS Form W-2 and Earnings Summary" because the form uses the word "earnings" in its title. He also cites 26 C.F.R. § 1.83-7(a), which uses the word "compensation" when it includes income realized from stock option transactions as a component of gross income.

This regulation and the W-2 form, however, define compensation for general taxation purposes and not for the specific purpose of benefit plans.[14] The fact that

---

14. Individuals are taxed on their "taxable income." 26 U.S.C. § 1. "Taxable income" is "gross income" less any allowed deductions. 26 U.S.C. § 63(a). The tax code lists a number of items specifically included in "gross income," 26 U.S.C. § 71, *et seq.,* including

"property transferred in connection with the performance of services," 26 U.S.C. § 83. Gains from stock option transactions are specifically included as "property transferred in connection with the performance of services." 26 C.F.R. § 1.83-7(a).

the Tax Code addresses "compensation" in the more specific area of benefit plans limits the applicability of this definition. Moreover, the benefit plan definition incorporates the broader § 1.83–7(a) definition as part of the two alternative definitions of "compensation." As already discussed, the Plan Administrator acted reasonably in not choosing one of those alternative definitions.

The materials the Plan Administrator considered in making its decision were adequate and they strongly support its choice.

### 5. Whether the Plan Administrator's Interpretation Was Consistent with Earlier Interpretations of the Plan

This factor has already been addressed in earlier portions of this opinion. The Plan Administrator based its decision in large part on its earlier interpretation of the term "Earnings." This factor suggests that the Plan Administrator acted reasonably.

### 6. Whether the Decision Making Process Was Reasoned and Principled

When the Plan Administrator received Scipio's benefits calculation request, it contacted people involved in the drafting of the Plan as well as outside counsel to determine whether its interpretation was inconsistent with the drafters' intent or any applicable law. These people informed the Plan Administrator that its interpretation was consistent with both.

The Plan Administrator's acts of identifying a problem, gathering information and obtaining a neutral legal opinion from an outside source is a reasoned and principled means of making a decision. This factor weighs in favor of a finding of reasonableness.

### CONCLUSION

Even considering the Plan Administrator's conflict of interest, the Court finds that United's decision to exclude Scipio's gain from his 1993 stock option transaction as a part of "Earnings" was objectively reasonable and supported by substantial evidence.

Accordingly, the Court **GRANTS** the defendants' Motion For Summary Judgment (dkt. no. 18) and **DENIES** the plaintiff's Motion For Summary Judgment (dkt. no. 15). In light of its decision on the parties's motions that reach the merits, the Court further **DENIES** the plaintiff's Motion For Partial Summary Judgment On The Defendants' Affirmative Defenses (dkt. no. 17) as moot.

As there are no remaining issues in this case, the Court **DISMISSES** it **WITH PREJUDICE** from the docket.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.